# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| JOHN DOE I and JOHN DOE II, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BJC HEALTH SYSTEM d/b/a BJC HEALTHCARE,<br><br>Defendant. | CASE NO. 22-cv-00919<br><br>(Removal from: the Missouri Circuit Court Twenty-Second Judicial Circuit, City of St. Louis, 2222-CC09151)<br><br>Jury Trial Demanded |

## NOTICE OF REMOVAL

Beginning in 2004, the federal government engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions BJC Health System d/b/a BJC HealthCare (BJC) has taken in connection with pursuing that directive. BJC therefore removes this case pursuant to the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). In support of this removal, BJC provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. On July 25, 2022, Plaintiffs John Doe I and John Doe II filed a Petition against BJC in the Circuit Court for the City of St. Louis, Missouri, Case No. 2222-CC09151.

2. Plaintiffs served BJC with the Petition on August 3, 2022.

3. Plaintiffs' five-count Petition challenges BJC's alleged practices on BJC's public website and within BJC's MyChart patient portal as claimed violations of Missouri law, including the Merchandising Practices Act and Identity Theft statute. (Pet. ¶¶ 183-229.)

4. According to plaintiffs, BJC operates a website that provides information to the public and allows patients to communicate "about bill payment, doctors, services, treatments, conditions, appointments," and provides access to an online "MyChart patient portal." (*Id.*, ¶ 19.)

5. Plaintiffs allege that BJC employs "source code" on its website and within its patient portal for various third-party services (such as Google and Facebook) who, in turn, help BJC "measure traffic and optimize" its "online marketing." (*Id.*, ¶ 43.)

6. Plaintiffs do not allege BJC discloses names, social security numbers, diagnoses, birth dates, or comparable information to the third-parties. Instead, plaintiffs highlight data such as internet protocol (IP) addresses, "cookie identifiers," and "browser fingerprints." (*Id.*, ¶¶ 121, 125-26.)

7. Plaintiffs each allege that they are "BJC patient[s]" and "MyChart patient portal user[s]." (*Id.*, ¶¶ 1-2; *see also id.*, ¶ 16.)

8. Based on these facts, plaintiffs seek to bring this case as a putative class action, *id.*, ¶ 174, and assert claims for: (1) breach of fiduciary duty of confidentiality, *id.*, ¶¶ 183-88, (2) intrusion upon seclusion, *id.*, ¶¶ 189-98, (3) violation of the Missouri Merchandising Practices Act, *id.*, ¶¶ 199-209, (4) "felony computer crimes," *id.*, ¶¶ 210-21, and (5) identity theft, *id.* ¶¶ 222-29.

## BASIS FOR REMOVAL

9. BJC removes this case pursuant to the Federal Officer Removal Statute, codified at 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an official or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

10. The Supreme Court has directed that the Federal Officer Removal Statute is to be "liberally construed," and defendants routinely remove under this statute when they are acting

under color of federal office. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). To do so, they must show that they "acted under the direction of a federal officer," that "there was a causal connection between its actions and the official authority," and that "there is a colorable federal defense to the plaintiff's claims." *Graves v. 3M Co.*, 17 F.4th 764, 767 (8th Cir. 2021).

11. These requirements are met here. Beginning in 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized providers who participate in the Medicare and Medicaid program (like BJC) to offer patients online access to their records, and to optimize patient engagement with their medical information. The conduct of BJC at issue in the Petition was taken under the direction of a federal officer, there is a causal connection between its actions and the official authority, and BJC has a colorable federal defense to Plaintiffs' claims. The requirements for removal are met.

12. Two other federal courts have denied motions to remand the same basic putative class action complaint claiming website privacy violations, finding in both cases removal to federal court was appropriate under the Federal Officer Removal Statute. *Doe, et al. v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020) ("UPMC has shown that by its participation in the Meaningful Use Program, it was 'acting under' DHHS when it engaged in the conduct at issue in the Complaint."); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020) ("Because Defendant's participation assisted the federal government in achieving that goal [to create a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

### *The Meaningful Use / Promoting Interoperability Program*

13. In 2004, President Bush issued an Executive Order establishing a National Health Information Technology Coordinator, now known as The Office of the National Coordinator for Health Information Technology (ONC). *See* Exec. Order 13335 (Apr. 27, 2004), available at https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf, last visited August 31, 2022. The Order's purpose was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

14. Five years later, Congress codified the ONC in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress also allocated billions of dollars to the Centers for Medicare & Medicaid Services (CMS) to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

15. Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://dashboard.healthit.gov/strategic-plan/federal-health-it-strategic-plan-2015-2020.php, last visited August 30, 2022.

16. And, in the 2020-2025 plan, it noted that this has already happened, saying: "The federal government and private sector have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025*

available at https://www.healthit.gov/sites/default/files/page/2020-01/2020-2025FederalHealthIT%20StrategicPlan_0.pdf, last visited August 30, 2022.

17. One critical aspect of this strategy has been the CMS' "Meaningful Use" program, now referred to as the Promoting Interoperability Program. 42 C.F.R. § 495.2-495.370. This federal program aims to increase patient's "meaningful use" and engagement with electronic health records. *See, e.g.,* CMS.gov, *Promoting Interoperability Programs*, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms ("In 2011, CMS established the Medicare and Medicaid EHR Incentive Programs (now known as the Medicare Promoting Interoperability Program) to encourage EPs, eligible hospitals, and CAHs to adopt, implement, upgrade, and demonstrate meaningful use of certified electronic health record technology (CEHRT)"), last visited August 30, 2022).

18. Through 2021, the promoting interoperability program offered incentive payments to providers who participate in Medicare and Medicaid when they met specific criteria for increasing patient engagement with electronic health records. Now, participants that do not demonstrate "meaningful use" during reporting periods may be subject to downward payment adjustments under Medicare. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Scoring Methodology Fact Sheet*, available at https://www.cms.gov/files/document/2022-scoring-methodology-fact-sheet.pdf, last visited August 30, 2022.

19. The requirements include: adopting federally certified technology, giving patients electronic access to health records and physicians, making it easier for patients to access electronic health information via smartphones, and making the records downloadable and transferable. *See* CMS.gov, *2022 Medicare Promoting Interoperability Program Requirements*, available at

5

https://www.cms.gov/regulations-guidance/promoting-interoperability/2022-medicare-promoting-interoperability-program-requirements, last visited August 30, 2022.

20. To achieve those specifications, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records. *See, e.g.,* ONC, *Patient Engagement Playbook*, available at https://www.healthit.gov/playbook/pe/introduction/ ("Patient portals hold enormous potential to improve patient care and practice workflow."), last visited August 30, 2022.

21. The ONC has specified how providers can optimize such portals; "how a patient portal helps achieve meaningful use requirements"; and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals for Patient Engagement* available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf, last visited August 30, 2022.

22. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, including Google and Facebook. *See generally* Medicare.gov, Privacy Policy, https://www.medicare.gov/privacy-policy, last visited August 30, 2022.

23. For instance, CMS engages Facebook to "place[] a cookie or pixel . . . for conversion tracking on certain pages of CMS website. [This] allows Facebook Ads to measure the performance of CMS advertisements based on consumer activity and to report the ad performance to CMS." *See* HHS, *Third Party Websites and Applications Privacy Impact Assessment – Facebook Ads* (Sept. 4, 2018) available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html, last visited August 30, 2022.

6

### *BJC is a "Person"*

24. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

25. While the statute is silent as to the definition of a "person," organizations and corporate defendants have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010).

26. BJC is a non-profit organization in Missouri, Pet. ¶¶ 3-4, and thus is a person under the statute.

### *BJC is Acting Under a Federal Officer*

27. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is assisting or helping to carry out a federal officer's duties or tasks, and whether the relationship between the government and private entity involves "detailed regulation, monitoring, or supervision." *Watson*, 551 U.S. at 153. To satisfy this element, a private person's actions "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphasis in original).

28. These factors show that removal is appropriate here. *First*, BJC is "helping the government produce" the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, including stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* CMS, *Promoting Interoperability Programs*, 2020-2025 Strategic Plan.

29. *Second*, in the absence of BJC's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its

mission to make patient portals available nationwide. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, the government would likely attempt to do exactly that.

30.     *Third*, the government has specified how to best enhance patient engagement, including through a patient portal. It has clarified how to generally design the portals and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

31.     *Finally*, the government has created an office dedicated to this issue and has closely monitored the work of private entities (like BJC). It has also supervised the general development of this information technology infrastructure. And, because promoting interoperability participation impacts Medicare payments to eligible healthcare providers, CMS substantially regulates BJC and comparable organizations. As the Northern District of Ohio has held: "The aim of PIP is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' prong." *ProMedica*, 2020 WL 7705627, at *3.

### *Plaintiffs' Claims Relate to the Actions Under Color of Federal Office*

32.     Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office.

33.      As set forth above, plaintiff's petition targets BJC's alleged use of common website analytical tools on BJC's so-called "web properties," along with the use of marketing companies in conjunction with its patient portal and public website. (*E.g.,* Pet. ¶¶ 13, 16, 19-31; *see also id.*, ¶ 32 (alleging that "[a]s a BJC patient and MyChart patient portal user, Plaintiffs exchanged communications with BJC through its web properties, including the MyChart portal").

34. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use / Promoting Interoperability program envisions. As plaintiffs themselves allege, the entire point of using the third-party services is to direct traffic to, and increase engagement with, BJC's website and portal. For example, he alleges that Google Tag Manager, "help[s] you measure traffic and optimize your online marketing." (Pet. ¶ 43.) Likewise, plaintiffs allege that the "Facebook Tracking Pixel" helps to "track Facebook and other ad-driven activity on their website." *Id.*, ¶ 93.

35. The gravamen of plaintiff's petition thus targets BJC's efforts to satisfy the promoting interoperability and meaningful use program criteria. Stated plainly, for the Court to rule in plaintiffs' favor, it would need to restrict the conduct that BJC could undertake to meet those federal standards. This infringement on a federal prerogative is precisely the type of case that "relates to" or is "undertaken for" federal office. *See ProMedica*, 2020 WL 7705627, at *3 (finding that defendant established a causal nexus; "As *UPMC* held, 'There is plainly a connection or association between [the health care provider's] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability.'") (quoting *UPMC*, 2020 WL 4381675, at *6).

### *BJC Raises Colorable Federal Defenses to Plaintiffs' Claims*

36. The final requirement for removal under this statute is to raise a colorable defense. For a defense to be considered colorable, courts "do not require that the federal officer virtually 'win his case before he can have it removed.'" *Robinson*, 2020 WL 376324, *2 (quoting *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999)). Instead, "it need only be plausible." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).

37. There are at least two colorable federal defenses to the claims at issue here that satisfy this requirement.

38. *First*, BJC will argue that the specific information that is purportedly disclosed (i.e., IP addresses and other web metadata) are outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and the scope of the federal HIPAA regulations generally, contrary to plaintiffs' allegations. This defense turns on an interpretation of federal law and is therefore sufficient to satisfy this element.

39. *Second*, BJC will argue that the First Amendment bars plaintiffs' claims. In *IMS Health Co. v. Sorrell*, 564 U.S. 552 (2011), the Supreme Court held that "the creation and dissemination of information are speech within the meaning of the First Amendment." *Id.* at 570 (emphasis added). Plaintiff's entire Petition challenges how BJC allegedly uses website analytics to enhance BJC's ability to speak to the public, through the creation and dissemination of information. (*E.g.,* Pet. ¶¶ 121, 125-26.)

40. As the Supreme Court has also held, specific with respect to First Amendment protection on the internet: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. Am. Civil Libs. Union*, 521 U.S. 844, 868 (1997)).

## PROCEDURAL REQUIREMENTS FOR REMOVAL

41. BJC satisfies all of the procedural requirements for removal under 28 U.S.C. § 1446.

42. BJC is filing this Notice of Removal within thirty (30) days of its receipt of the Petition by "service," 28 U.S.C. § 1446.

43. BJC files this Notice in the United States District Court for the Eastern District of Missouri, because the State court in which the action is pending, the Circuit Court for the City of

St. Louis, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

44. BJC has attached a copy of the Summons, Return Summons, and Petition that were served upon BJC to this Notice as well as all publicly available filings from the state court docket.

45. Upon filing this notice, BJC will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Circuit Court for the City of St. Louis.

## CONCLUSION

Plaintiff's Petition directly challenges practices and procedures BJC has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiffs' Petition is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

Dated: September 1, 2022

Respectfully submitted,

/s/ John D. Comerford
John D. Comerford, #60164MO
Adam J. Simon, #68396MO
DOWD BENNETT LLP
7733 Forsyth Blvd., Suite 1900
St. Louis, MO  63105
Telephone: (314) 889-7300
Facsimile: (314) 863-2111
Email: jcomerford@dowdbennett.com
       asimon@dowdbennet.com

Paul Karlsgodt (29004)
BAKER & HOSTETLER LLP
1801 California Street, Suite 4400
Denver, CO 80202
Telephone: (303) 861-0600
Facsimile: (303) 861-7805
Email: pkarlsgodt@bakerlaw.com

David A. Carney (0079824) (*pro hac vice forthcoming*)
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile: (216) 696-0740
Email: dcarney@bakerlaw.com

*Attorneys for Defendant BJC Health System d/b/a BJC HealthCare*

**CERTIFICATE OF SERVICE**

I certify that on September 1, 2022, I filed the foregoing *Notice of Removal* with the Court's ECF system. A copy will be sent electronically to all counsel of record by operation of the ECF system.

>  */s/* John D. Comerford
>  *One of the attorneys for BJC HealthCare*